2007-NMCA-012

149 P.3d 1027

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**James F. DUARTE, Defendant–Appellant.**

**No. 25,878.**

Court of Appeals of New Mexico.

Dec. 7, 2006.

Patricia A. Madrid, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Appellee.

Michael J. Dugan, Las Cruces, NM, for Appellant.

## OPINION

SUTIN, Judge.

{1} Defendant James F. Duarte was arrested at a sobriety roadblock. Among other convictions, he was convicted of driving while intoxicated (DWI) under NMSA 1978, § 66–8–102(C)(1), (G) (2004) (amended 2005). He asserts district court error (1) in not suppressing evidence because the police officer lost a videotape of field sobriety tests, thus depriving Defendant of evidence and prejudicing his right to a fair trial; (2) in not excluding evidence because of the State's late disclosure of witnesses and documents, prejudicing his ability to adequately prepare for trial; (3) in admitting results of a breath alcohol test because Defendant was not advised of his right to independent testing as required under NMSA 1978, § 66–8–109(B) (1993); and (4) in admitting evidence that was obtained after the police officer improperly exercised discretion in questioning Defendant outside of the narrow confines of instructions the officer was to follow at the roadblock, resulting in an unlawful seizure in violation of the Fourth Amendment to the United States Constitution. We affirm.

## BACKGROUND

{2} Officer Cory Crayton arrested Defendant at what is commonly called a DWI roadblock after the following circumstances occurred. Defendant first denied, but then later admitted drinking; the officer saw an open bottle of beer between Defendant's feet; Defendant looked for but could not find any registration or insurance documents; Defendant spilled the beer as he stepped out of the vehicle; Defendant admitted that he had drunk about three inches from the open bottle of beer and that he and a friend had drunk a six-pack; the officer learned that the vehicle registration had expired, and that the vehicle was not insured; Defendant smelled of alcohol and had bloodshot, watery eyes; and Defendant did not perform well on field sobriety tests. After Defendant was arrested, he was given two breathalyzer tests, which produced results of 0.13 breath alcohol content.

## DISCUSSION

### A. Lost Videotape

■ {3} The denial of a motion to sanction by dismissal or suppression of evidence is reviewed for abuse of discretion. *State v. Riggs,* 114 N.M. 358, 361, 838 P.2d 975, 978 (1992). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Caudillo,* 2003–NMCA–042, ¶ 12, 133 N.M. 468, 64 P.3d 495 (internal quotation marks and citation omitted).

{4} Because Officer Crayton's audio equipment did not work during the field sobriety tests that were first administered, a second set of field sobriety tests was given to Defendant, this time using video equipment. However, the video of the second set of field sobriety tests was lost. At trial, the officer testified on direct examination as to the results of the first set of field sobriety tests. He did not testify on direct examination as to the results of the second set of tests. On cross-examination, he testified that he did not know how Defendant did on the second round of tests and that he based his arrest of Defendant on the first round of tests and not on the second.

{5} The day before trial, Defendant filed a motion in which he claimed prejudice because the State had not produced and was unable to produce the videotape but had a duty to do so. Acknowledging the district court's discretion in granting a remedy for losing evidence, Defendant suggested that the court should dismiss or exclude all evidence that might have been impeached if the tape had

not been lost, relying on *State v. Chouinard,* 96 N.M. 658, 661–62, 634 P.2d 680, 683–84 (1981), which enunciates a test to determine if a deprivation of evidence violates a defendant's due process right.

{6} Defendant's motion was heard on the morning of trial. The State admitted that it had a duty to preserve the tape and that the tape was material. The State argued that the loss of the tape was unintentional and that Defendant was not prejudiced. Defense counsel examined Officer Crayton on the customary use of, and purpose for using, the video equipment. Both defense counsel and the court questioned the officer in regard to customary practice of preserving videotapes and on the loss of the tape in question. Defense counsel stated that he was not making an issue out of the tape being intentionally lost or kept from him.

{7} The district court determined that the loss of the videotape was not intentional. While noting that a video can fairly significantly impeach an officer, the court stated that it was not going to dismiss the case, and indicated to defense counsel that he "[u]ndoubtedly ... [was] going to make some hay with the jury over this videotape being lost[,]" and that the court would allow defense counsel to "question thoroughly about why and how it could have been lost," because "that's clearly impeachment." Defense counsel followed up by acknowledging that dismissal was an extreme remedy but arguing that "certainly [the] sobriety test could be suppressed based upon the fact, by [the prosecutor's] admission, it's a material piece of evidence." After being critical about the State's "loose" handling of the evidence, the court again indicated that defense counsel could question the officer at length about how and why he lost the videotape, stating "those things are not lost on the jury."

{8} On appeal, Defendant contends that because the State conceded that it had a duty to preserve the evidence and that the evidence was material, the only issue before the district court was whether Defendant was prejudiced. Defendant argues "extreme prejudice" because the officer "could not remember much of what happened," and Defendant argues that he was "severely prejudiced" because he was not able to effectively cross-examine the officer regarding the ad-

ministration and scoring of the field sobriety tests, particularly given the fact that the officer was unable to state what the standards for administering the tests were and what instructions he gave to Defendant.

{9} The State argues lack of prejudice because the officer did not testify regarding the tests that were videotaped, Defendant was allowed to extensively cross-examine the officer about the lost tape and to argue the significance of that to the jury, and, notwithstanding the officer's weak recollection of standards and instructions, the officer was able to describe the first field sobriety testing.

{10} *Chouinard* sets out a three-part test to determine whether deprivation of evidence is reversible error for denial of a fair trial and thus a denial of due process: "1) The State either breached some duty or intentionally deprived the defendant of evidence; 2) The improperly suppressed evidence must have been material; and 3) The suppression of this evidence prejudiced the defendant." 96 N.M. at 661, 634 P.2d at 683 (internal quotation marks and citation omitted). In discussing the manner in which a court is to analyze the issue and the relief for a defendant when the test is met, *Chouinard* stated:

Where the loss is known prior to trial, there are two alternatives: Exclusion of all evidence which the lost evidence might have impeached, or admission with full disclosure of the loss and its relevance and import. The choice between these alternatives must be made by the trial court, depending on its assessment of materiality and prejudice. The fundamental interest at stake is assurance that justice is done, both to the defendant and to the public.

. . . .

Determination of materiality and prejudice must be made on a case-by-case basis. The importance of the lost evidence may be affected by the weight of other evidence presented, by the opportunity to cross-examine, by the defendant's use of the loss in presenting the defense, and other considerations. The trial court is in the best position to evaluate these factors.

*Id.* at 662–63, 634 P.2d at 684–85; *see also Riggs,* 114 N.M. at 361, 838 P.2d at 978

(setting out the same three-part test from *Chouinard* ).

{11} For several reasons, we are unable to say that the district court abused its discretion in choosing not to dismiss or to exclude evidence. The evidence of Defendant's guilt is strong in this case. *See id.* ("Even if the [*Chouinard* ] three-part test is met, reversal is not mandated unless the evidence is in some way 'determinative of guilt.'" (citation omitted)). The performance of a second set of field sobriety tests was only one of several indicia of Defendant's intoxication, and whether the second set of tests was indicative of sobriety was overshadowed by the .13 breath alcohol content reading that appears to have been taken at the site of the roadblock. Defendant did not show that had the videotape been available it would have undercut the prosecution's case or that the tape's absence materially affected a determination of guilt or innocence. *See Chouinard,* 96 N.M. at 663, 634 P.2d at 685 (indicating that there must be a "realistic basis, beyond extrapolated speculation, for supposing that availability of the lost evidence would have undercut the prosecution's case"); *State v. Bartlett,* 109 N.M. 679, 681, 789 P.2d 627, 629 (Ct.App.1990) (stating that "[t]he prejudice prong of the *Chouinard* test contains at least two components: the importance of the missing evidence to [the] defendant, and the strength of the other evidence of [the] defendant's guilt"). Further, the officer did not testify about the second set of field sobriety tests and thus did not attempt to bolster Defendant's intoxicated status by describing Defendant's performance on the second set of tests. In addition, Defendant was given carte blanche to cross-examine the officer about the lost tape and to argue the significance of that testimony to the jury, including attacking the credibility and reliability of the officer, and Defendant took those opportunities. Defendant also had at his disposal the officer's report, which contained additional information specifically related to the field sobriety tests. Thus, for the foregoing reasons, we hold that Defendant failed to establish prejudice.

{12} The district court evaluated the issue before trial. We have the benefit of evaluating the issue after the evidence was in. We hold that the court's handling of the issue of the lost videotape was not an abuse of discretion.

## B. Late Disclosure of Witnesses and Documents

{13} Defendant complains that the State added two additional witnesses to its list of witnesses five days before trial, produced documentation regarding certification of the breathalyzer tests three days before trial, and produced calibration of the testing equipment one day before trial. Defendant asserts that "[t]he late disclosure did not allow adequate time for preparation of a defense."

{14} We review a district court's ruling on late discovery for abuse of discretion. *See State v. McDaniel,* 2004–NMCA–022, ¶ 6, 135 N.M. 84, 84 P.3d 701. "In order to find an abuse of discretion, we must conclude that the decision below was against logic and not justified by reason." *Id.*

{15} "Failure to disclose a witness' identity prior to trial in itself is not grounds for reversal. Defendant has the burden of showing that he was prejudiced by the untimely disclosure." *State v. Vallejos,* 2000–NMCA–075, ¶ 32, 129 N.M. 424, 9 P.3d 668 (internal quotation marks and citation omitted).

> In considering whether late disclosure of evidence requires reversal, a reviewing court will consider the following factors: (1) whether the State breached some duty or intentionally deprived the defendant of evidence; (2) whether the improperly non-disclosed evidence was material; (3) whether the non-disclosure of the evidence prejudiced the defendant; and (4) whether the trial court cured the failure to timely disclose the evidence.

*McDaniel,* 2004–NMCA–022, ¶ 8, 135 N.M. 84, 84 P.3d 701 (internal quotation marks and citation omitted). *See generally* Rule 5–501 NMRA (stating the initial duty of the State to disclose evidence in a criminal trial); Rule 5–505 NMRA (setting out the duty of parties to disclose any additional evidence or witnesses and setting out various remedies for the violation of this rule). The test for materiality, the second factor, is whether

"there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *McDaniel*, 2004–NMCA–022, ¶ 11, 135 N.M. 84, 84 P.3d 701 (internal quotation marks and citation omitted). As for determining whether the defendant has been prejudiced, the third factor, we look at whether the defense's case "would have been improved by an earlier disclosure or how [the defense] would have prepared differently for trial." *Id.* ¶ 14.

{16} The issue of late discovery was argued on the first day of trial, before trial began. Defendant asserted that three pieces of evidence were disclosed late: (1) the names of two additional witnesses were disclosed five working days before trial; (2) documentation regarding the certification of the breath test machine and the officer administering the test were disclosed three working days before trial; and (3) calibration logs for the breath test machine were disclosed the day before trial.

{17} Regarding the late disclosure of the witnesses, in its initial disclosure after arraignment, the State listed the arresting officer, the officer who administered the breath test, and "[a]ny and all witnesses named in police reports." Later, five working days before trial, the State submitted an amended witness list which named two additional officers, who were supervising the roadblock. The State indicated that the names of these officers were listed in the police reports initially disclosed in July. Defendant did not dispute this point. Defendant also pointed out that, while the name of another witness was disclosed in the initial witness list, the State did not identify that witness as being the one who performed the calibration on the breath test machine until the day before trial when the calibration logs were supplied to Defendant. After reflecting on the chronic problem of late discovery in criminal cases in the Third Judicial District and chastising the prosecution's history of late discovery, the court explained that Defendant could have discovered the specific role of the witnesses disclosed in July and pointed out to defense counsel that "[y]ou can talk to those witnesses and you can do the things necessary to prepare." On appeal, the State points out that the two later-identified additional supervising officers were never called to testify.

{18} Applying the test for determining whether to reverse a conviction based on the late disclosures to the case at hand, we believe it is clear that the State had a duty to disclose these witnesses. Rule 5–501(A)(5). We need not reach the issue whether the State complied with its duty by the disclosures in its initial witness list. *Cf. McDaniel*, 2004–NMCA–022, ¶¶ 9–10, 135 N.M. 84, 84 P.3d 701 (determining that the State met its duty to disclose the identity of a witness when it disclosed the witness as soon as she was located). Even if we were to conclude here that the State had not fulfilled its duty, Defendant has not demonstrated that the information was material by indicating that there is a reasonable probability that the outcome of the trial would have been different had the disclosure been made earlier. *See id.* ¶ 11 (stating that, in the context of the late disclosure of information, for evidence to be material there must be a reasonable probability that the outcome of the proceedings would have been different had the information been disclosed earlier). Nor has Defendant convincingly demonstrated that he was prejudiced by the late disclosure, or that the district court failed to cure any prejudice resulting from the late disclosure. Defendant had the opportunity to interview the witnesses and two of the witnesses did not testify at trial. *See Vallejos*, 2000–NMCA–075, ¶ 34, 129 N.M. 424, 9 P.3d 668.

{19} As to the late disclosure of the documents showing certification and the calibration logs relating to the breath test machine, the State conceded that it had a duty to disclose this evidence and apologized for the late disclosure. Even assuming that the State breached its duty to disclose this evidence, again, Defendant has not demonstrated materiality or prejudice. While Defendant argued to the district court that the machine was a different machine from what he was used to seeing, and therefore he could not just look at the calibration logs and determine if the machine was correctly calibrated without research, Defendant does not indicate on appeal that the outcome of the trial

would have been different had he received this information earlier. *See McDaniel,* 2004–NMCA–022, ¶ 11, 135 N.M. 84, 84 P.3d 701. Defendant does not assert on appeal that he, at any time, discovered that the calibration records showed that the machine was improperly calibrated, or that the machine certification was erroneous or invalid. Further, neither below nor on appeal does Defendant argue that earlier disclosure of the certification information in this case would have produced a different result at trial or that his defense would have been improved or he would have defended differently had there been an earlier disclosure. Defendant has not demonstrated that the evidence was material, nor has he demonstrated prejudice. *See id.* ¶¶ 11–15. Accordingly, we will not reverse Defendant's conviction on the grounds of the late disclosure of the certification information and the calibration logs

## C. Advice of Right to Independent Alcohol Content Test

■■■ {20} Section 66–8–109(B) in the Implied Consent Act requires that a person be advised of the right to an independent chemical test for blood or breath alcohol content in addition to any test performed at the direction of a law enforcement officer. Defendant contends that he was not advised of this right, and that the State, therefore, did not comply with Section 66–8–109(B) and the breath test results should have been excluded. *Cf. State v. Jones,* 1998–NMCA–076, ¶ 19, 125 N.M. 556, 964 P.2d 117 (indicating that the officer must give advice substantially in compliance with Section 66–8–109(B), but that "[s]trict compliance with the statute is not required because words other than those used in the statute can convey the information required").

{21} The testimony on this issue was as follows:

[Prosecutor:] Okay. Then what happened [after the officer placed Defendant under arrest]?

[Officer:] Then I read him the implied consent with the [news] video camera staring at us. He denied consent because of the video camera.

. . . .

[Prosecutor:] Okay. You talked about implied consent. Is there a full name for that?

[Officer:] The New Mexico Implied Consent Act.

[Prosecutor:] Okay. Can you tell the ladies and gentlemen of the jury just briefly what is the New Mexico Implied Consent Act?

[Officer:] It asks a person to voluntarily submit to chemical testing, whether it be breath, blood, or both. You can refuse it. But you will lose your license up to a year, and you can accept. If you accept, then that is going to show what your breath or blood alcohol is.

[Prosecutor:] What is the procedure for when you are reading the New Mexico implied consent, what actually takes place?

[Officer:] What do you mean?

[Prosecutor:] Like for you to say, I am going to read the New Mexico Implied Consent Act, do you read it off a card?

[Officer:] Oh, yes, sir. I have a card that I keep in my ticket book.

[Prosecutor:] So what do you normally do?

[Officer:] Read it exactly how it says on that card.

[Prosecutor:] Do you have that card present with you?

[Officer:] It's on the table over there.

[Prosecutor:] Did you follow the procedure when you read the New Mexico implied consent law with the defendant?

[Officer:] Yes, sir.

There was also testimony from the officer who administered the breath test that all implied consent cards issued by the New Mexico Scientific Laboratory Division are standardized and these cards are what are used by the police officers. In addition, there was testimony that the card contained, among other statements, the statement that a subject has the right to an independent test.

{22} The facts are not disputed. What is disputed is whether the district court erred in concluding from the facts that the officer advised Defendant of his right to an indepen-

dent test. Neither the State nor Defendant favors this Court with a standard of review to assist us on this issue. It appears to us that if the officer gave Defendant the advice, there would be no basis on which to exclude the breath test results, and if the officer did not give the advice, there would be an arguable basis on which to exclude the breath test results. Under these circumstances, a reviewing court might view the standard of review to be either abuse of discretion, *see State v. Gardner*, 1998–NMCA–160, ¶ 5, 126 N.M. 125, 967 P.2d 465, or de novo, *see State v. Montoya*, 1999–NMCA–001, ¶ 5, 126 N.M. 562, 972 P.2d 1153.

{23} We need not analyze here which standard controls because we determine that, from the aforementioned testimony, the district court could reasonably conclude that the officer read to Defendant what was written on the card and that the officer informed Defendant of his right to an independent test. The court did not abuse its discretion or otherwise err in admitting the test results in evidence.

## D. The Officer's Question Outside the Scope of His Script

{24} Defendant claims that his Fourth Amendment rights were violated by Officer Crayton's exercise of discretion in deviating from a supervisor-prepared script of questions when he asked Defendant whether he had been drinking. As we will discuss in more detail further on in this opinion, Defendant bases this claim on New Mexico case law that requires for the implementation of DWI roadblocks minimal motorist intrusion through law enforcement supervisory procedural planning that limits unbridled discretion of officers in the field. *See City of Las Cruces v. Betancourt*, 105 N.M. 655, 658, 735 P.2d 1161, 1164 (Ct.App. 1987). It is the assurance of supervisory limitation on discretion which constitutionally permits stopping motorists at roadblocks without a showing of individualized suspicion of criminal activity. *See State v. Bates*, 120 N.M. 457, 460, 902 P.2d 1060, 1063 (Ct.App. 1995).

{25} We first set out the pertinent circumstances of the roadblock in this case, together with the precise issue that Defendant raises. We then analyze United States Supreme Court and New Mexico case law relating to roadblocks. Finally, we narrow in on the claimed constitutional violation, namely, whether the officer's deviation from procedure during preliminary questioning upon first contact between the officer and Defendant violated Defendant's Fourth Amendment rights, requiring application of the exclusionary rule as to all evidence of drinking and intoxication discovered after the question was asked.

## 1. Circumstances and Issue

{26} In a briefing by his supervisors before the DWI roadblock was set up, Officer Crayton was given a script of what to say as he approached a stopped motorist. Pursuant to the script, Officer Crayton was to say "good evening, sir, or ma'am," and then say: "I am an officer with the New Mexico State Police. This is a DWI sobriety checkpoint. May I see your driver's license, vehicle registration, proof of insurance?" Nothing on the script mentioned asking someone if they had had something to drink.

{27} As Officer Crayton approached Defendant's vehicle, the officer said, "I am Officer Crayton, State Police. This is a DWI roadblock. Have you been drinking tonight?" After Defendant responded "no," the officer said, "Okay, let me see your driver's license, registration, and insurance." Defendant gave the officer his ID card, and began to look for his registration and insurance information, at which time the officer shined his flashlight inside the vehicle and saw an open bottle of Busch beer between Defendant's feet. After Defendant stated that he could not find his registration and insurance, the officer told Defendant that he had seen the beer bottle and asked Defendant to pull over to the side of the road. The officer asked Defendant to exit the vehicle and upon exiting the vehicle, Defendant spilled the beer. The subsequent investigation indicated that the vehicle registration had expired and the vehicle was not insured. Defendant admitted he had been drinking, and the officer testified that he smelled alcohol on Defendant's breath "the whole time," and that Defendant had bloodshot, watery eyes. Also, the officer conducted field sobri-

ety and blood alcohol tests. On appeal, Defendant's sole focus is on the officer's question, "Have you been drinking tonight?" And Defendant's sole complaint in regard to the question is that the question was not on the script of questions provided by his supervisors. The officer acknowledged that he made the choice to ask something outside what he was instructed to say.

{28} During the first day of trial, Defendant's counsel told the court that Defendant was "not going to challenge the constitutionality of the roadblock," but that Defendant had "an issue with the actual administration to [Defendant], based on the standards that were set forth by the supervisors." Counsel later clarified this by stating that Defendant's "objection to the stop is not that the roadblock was unconstitutional in and of itself, but, in fact, that the officer didn't follow [the] guidelines but used his discretion when he encountered [Defendant]." Acknowledging that Officer Crayton "asked an extra question that was different from the script that was given [to him] at the briefing," the district court nevertheless determined that the deviation was "not a defect that would give rise to a dismissal or a suppression" and, treating Defendant's objection as a motion to dismiss or to suppress, the court denied the motion.

{29} Defendant asserts that decisions regarding roadblocks "must be made by supervisory personnel and the discretion of the field officers at the roadblock must be limited regarding the manner in which the vehicles are stopped." In support of this assertion, Defendant relies on *Bates,* in which this Court emphasized the importance "[i]n determining the reasonableness of a roadblock, . . . [of] the role of supervisory personnel and the restrictions on discretion of field officers." 120 N.M. at 463, 902 P.2d at 1066. Defendant points out that Officer Crayton's question, "Have you been drinking tonight?" was not within his supervisor's instructions to "approach and greet everyone in the same manner."[1] The officer's question about drinking, according to Defendant, "change[d] the nature of the seizure significantly," and resulted in an illegal seizure in violation of the Fourth Amendment to the United States Constitution.

{30} Thus, Defendant raises only the alleged Fourth Amendment infirmity of the officer's exercise of discretion by asking a question not in his supervisor's script of questions for motorists. Based on the very limited scope of this attack, we note at the outset what this case is not about. Defendant does not assert that the deviation from script violated the New Mexico Constitution. We therefore do not go there. *See State v. Jason L.,* 2000–NMSC–018, ¶ 9, 129 N.M. 119, 2 P.3d 856 (reviewing a claim of unlawful seizure only under the Fourth Amendment where the defendant did not argue that the New Mexico Constitution afforded him greater protection); *see also State v. Madalena,* 121 N.M. 63, 69, 908 P.2d 756, 762 (Ct.App. 1995) (stating that "[t]he eight [*Betancourt*] factors impose additional and stricter guidelines than the balancing test used by the United States Supreme Court in [*Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)]" and holding that "a sobriety checkpoint conducted in substantial compliance with the eight *Betancourt* factors is constitutional under the New Mexico Constitution"). Further, this case is not about the constitutionality of any other aspect of the roadblock. Therefore, we need not scrutinize the constitutionality of the roadblock under the full gamut of the tests and guidelines laid out in *Betancourt* for determining whether a roadblock is reasonable under the Fourth Amendment. *See Betancourt,* 105 N.M. at 658–60, 735 P.2d at 1164–66 (setting out (1) a test requiring a balancing of (a) governmental interest and public concern served by a roadblock and the extent to which the roadblock advances those interests and concerns, against (b) the severity of the interference with individual liberty, security, and privacy; and (2) eight guidelines to be considered in determining the reasonableness of a roadblock). Finally, this case is not about the officer's request for license, registration, and insurance. *See State v. Goss,* 111 N.M. 530, 532, 807 P.2d 228, 230 (Ct.App.1991) (citing New Mexico

---

**1.** There is no evidence as to whether the officer asked the question of all drivers or just of Defendant, and the parties do not discuss this as an issue. We therefore will not address whether

cases upholding the constitutionality of "[r]outine police roadblocks established for the purpose of checking drivers' licenses, vehicle registrations, and the existence of vehicle liability insurance").

## 2. Standard of Review

{31} The issue of whether deviation from the script constitutes a Fourth Amendment violation is one of law which we review de novo. *See State v. Williamson,* 2000–NMCA–068, ¶ 6, 129 N.M. 387, 9 P.3d 70 (stating, in a traffic stop case involving a claimed impermissible expansion of the scope of inquiry requiring a court to balance the character of and justification for the intrusion, that "we examine, as a matter of law, the totality of the circumstances to determine whether the officer[ ] ... impermissibly expanded his scope of inquiry," calling for de novo review). The issue of whether the constitutional violation, if it exists, requires application of the exclusionary rule, involves the application of law to undisputed facts, and our review is de novo. *See State v. Lowe,* 2004–NMCA–054, ¶¶ 8–10, 18, 135 N.M. 520, 90 P.3d 539.

## 3. Case Law Related to Investigative Activity Associated with Roadblocks

{32} DWI roadblocks are "seizures" within the meaning of the Fourth Amendment. *Betancourt,* 105 N.M. at 657, 735 P.2d at 1163. The determination of "whether a particular roadblock violates the fourth amendment is basically one of reasonableness." *Id.* Reasonableness depends upon a "balance [of] the gravity of the governmental interest or public concern served by the roadblock" against "the severity of the interference with individual liberty, security, and privacy resulting from the roadblock." *Id.* at 658, 735 P.2d at 1164. A major concern lies in the "possibility of improper, unbridled discretion of the officers who meet and deal with the motoring public." *Id.* In one of the eight guidelines we adopted in *Betancourt,* we stated that "[i]t is also wise to instruct officers ... on uniform procedures to be utilized when stopping motorists. As nearly as possible, each motorist should be dealt with in precisely the same manner." *Id.* at 659, 735 P.2d at 1165.

this might be a significant distinction for the

{33} In *Bates,* the defendant attacked the constitutionality of a DWI roadblock on the grounds of lack of an empirical basis for the time and location of the roadblock and lack of adequate advance notice of the roadblock. *Bates,* 120 N.M. at 462–63, 902 P.2d at 1065–66. *Bates* quoted *State v. Bolton,* 111 N.M. 28, 32, 801 P.2d 98, 102 (Ct.App.1990), which involved a roadblock set up to detect violations of licensing, registration, and insurance liability laws, in noting that "[t]he reasonableness of a roadblock provides a constitutionally adequate substitute for the reasonable suspicion that would otherwise be required to justify the detention of vehicles and the questioning of their occupants." *Bates,* 120 N.M. at 460, 902 P.2d at 1063 (internal quotation marks and citation omitted). In *Bates,* among other procedures, field officers were under instructions to ask the same questions of each driver that was stopped and to keep their initial contact with the driver to one minute. *Id.* at 463, 902 P.2d at 1066. Although it does not appear that any particular questioning was at issue in *Bates,* we determined that, "on balance, the roadblock [was] set up so as to ensure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* (internal quotation marks and citation omitted). Significantly, in our analysis of reasonableness, we stated that "[i]n determining the reasonableness of a roadblock, all the [*Betancourt* ] factors must be considered, and none is dispositive but the role of supervisory personnel and the restrictions on discretion of field officers." *Id.* at 463, 902 P.2d at 1066; *see State v. Villas,* 2002–NMCA–104, ¶ 7, 132 N.M. 741, 55 P.3d 437 (indicating that in *Bates* this Court recognized "as dispositive" the *Betancourt* holding "that the police must implement uniform procedures at roadblocks as a means to restrict the discretion of field officers").

{34} Our most recent case, *Villas,* 2002–NMCA–104, ¶¶ 1–4, 132 N.M. 741, 55 P.3d 437, involved a constitutional attack on a field officer's wrongful post-stop conduct in allowing an intoxicated driver to go free because he was the brother of a fellow officer, a different treatment than that applied to other

purpose of this case.

intoxicated drivers. In *Villas*, the uniform procedure for officers included asking a set of scripted questions, and if an officer suspected that a driver had been drinking, the driver was directed to a secondary area and given sobriety tests. *Id.* ¶ 2. We determined that the particular conduct of the officer at issue was a post-stop procedural infirmity that would not affect the validity of the roadblock as to all drivers, and would "not invalidate other arrests made at the same roadblock." *Id.* ¶ 13. Still, we confirmed that the failure of the police to establish uniform procedures for a DWI roadblock will invalidate that roadblock. *Id.* ¶ 7.

{35} In none of the foregoing New Mexico cases was the issue of the constitutional propriety of specific field officer questioning of the driver or departures from a pre-approved script addressed. However, we see nothing in New Mexico decisions that in any way rules out appropriate limited questioning during the initial officer-motorist contact at a DWI roadblock. To the contrary, the courts appear to have assumed that properly set up roadblocks would include some uniform questioning of all motorists at the outset, and that individualized suspicion need not be shown to justify such questioning. As we have indicated earlier in this opinion, it is noteworthy that Defendant questions neither the content nor scope of the inquiry about drinking. He questions only the act of deviating from the script provided him by his supervisors, asserting that this deviation was constitutionally infirm simply because it was a deviation from the script.

{36} Ultimately, of course, the question in a Fourth Amendment roadblock case is that of the reasonableness of the roadblock. *See Villas*, 2002–NMCA–104, ¶ 11, 132 N.M. 741, 55 P.3d 437; *Madalena*, 121 N.M. at 66, 908 P.2d at 759; *Bates*, 120 N.M. at 460, 462, 902 P.2d at 1063, 1065; *Betancourt*, 105 N.M. at 657, 660, 735 P.2d at 1163, 1166. As we now explain, we cannot agree that the particular deviation from the prepared script in this case made the roadblock unreasonable as to Defendant.

### 4. The Intrusion and Deviation Analyzed

■ {37} In this case, the initial contact consisted of the officer identifying himself and the roadblock, and then asking Defen-

dant if he had been drinking that night. There can be no question that the foregoing contact occurred with minimal duration and intensity. Defendant does not contend otherwise. The issue confronting us reduces to whether the mere deviation from the script alone, as occurred in this case, was a sufficient invasion into personal privacy and security to render Defendant's roadblock detention unreasonable.

{38} What makes this a viable issue is the unique substitution of a properly implemented roadblock for the requirement of individualized suspicion. The elimination of the requirement for individualized suspicion creates the serious concern about lack of uniformity and need for limitation of discretion. At the very crux of the script deviation concern is the fear of unrestricted discretion in questioning, and the invidious, intrusive invasion of privacy that can occur from such discretion. The substitution was based in no small part on implanting the essential ingredient of standard and neutral criteria, established in advance by supervisory law enforcement officials, to assure minimal field officer discretion. Without this essential ingredient, a roadblock cannot survive constitutional scrutiny. *See Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (stating that "the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers").

■ {39} Yet, notwithstanding the unwavering requirement of the establishment of a plan by supervisors containing standard and neutral criteria, neither the United States Supreme Court nor this Court has required, much less even suggested, that questioning upon initial contact with a motorist be absolutely and finitely limited to a supervisor's script, from which an officer can deviate only upon pain of a brand of unconstitutionality. While officers in the field should not deviate from uniform law enforcement roadblock procedure and take a substantial risk of branding of unconstitutionality if they deviate, we do not think that a

bright-line test or blanket rule must be established that says that any deviation from pre-planned procedure will violate the Fourth Amendment. We will examine the totality of the circumstances in each case. *See State v. Johnson*, 2006–NMSC–049, ¶ 13, 140 N.M. 653, 146 P.3d 298 (stating that, in deciding the issue of exigent circumstances in knock and announce cases, "there are no bright-line rules," and the appellate courts "must look at the totality of the circumstances"); *State v. Lopez*, 2005–NMSC–018, ¶¶ 16–17, 19, 28, 138 N.M. 9, 116 P.3d 80 (disavowing a bright-line test or blanket rule "delineating reasonableness in knock and announce cases involving the exigency exception[,]" and stating that the "appellate court must consider the totality of the circumstances"); *State v. Gomez*, 1997–NMSC–006, ¶¶ 35, 39–45, 122 N.M. 777, 932 P.2d 1 (refusing to follow the federal bright-line automobile exception under the Fourth Amendment in interpreting our State Constitution, and applying a totality-of-circumstances test that recognizes variations in facts and circumstances). Thus, we decline to fix a deviation from a script of questions as a constitutional infirmity, without contemporaneous inquiry more broadly into the invasiveness and intrusion of the contact.

{40} In the present case, as we have stated earlier in this opinion, Defendant's detention was brief during the initial contact, and nothing about the context, content, scope, or purpose of the question about drinking has been attacked. Defendant attacks the question because it was not in the script. We are unpersuaded. The breach of procedure in this case was too insubstantial to constitute constitutional harm. At the point the question was asked, the deviation did not change the detention from one of reasonable detention to one of unreasonable detention or require an individualized suspicion of intoxication. The constitutional status of the roadblock remained intact during the brief, minimally intrusive initial contact, and the reasonableness of the initial contact and detention was not diminished by the question about drinking.

█ {41} On a cautionary note, however, our grant of slight latitude in this particular case should not be read as allowing broad officer discretion in questioning motorists or deviating from a supervisory plan or script. Close questions as to when the threshold of minimal discretion at DWI roadblocks is reached should be resolved in favor of privacy, not a broadening of discretion. Supervisors and field officers must exercise prudence and caution in DWI roadblock investigations. We neither fall on the side of a bright-line approach by which any deviation from a plan or script will render the roadblock unreasonable, nor on the side of incremental intrusion into privacy by deviating field officers. *Compare Commonwealth v. Anderson*, 406 Mass. 343, 547 N.E.2d 1134, 1138 (1989) (holding mere deviation unconstitutional), *with Brouhard v. Lee*, 125 F.3d 656, 660 (8th Cir.1997) (holding that no authority exists demanding "that an officer be held either to a script or denied reasonable discretion which is necessary to conduct a series of traffic stops occurring in a free and unstructured world"). What is required is keeping the exercise of discretion to a minimum and reasonable, not the absolute elimination of discretion. Certainly, it cannot be "left to the discretion of the officer to decide how intimidating he wishes[s] to be." *United States v. Huguenin*, 154 F.3d 547, 562 (6th Cir.1998). What is called for is, as *Brown* states, "a plan embodying explicit, neutral limitations on the conduct of individual officers[,]" with the end that unfettered governmental intrusion into privacy is constrained and minimal. 443 U.S. at 51, 99 S.Ct. 2637; *Delaware v. Prouse*, 440 U.S. 648, 662–63, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Martinez–Fuerte*, 428 U.S. 543, 562, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Bates*, 120 N.M. at 463, 902 P.2d at 1066; *Betancourt*, 105 N.M. at 658–59, 735 P.2d at 1164–65.

## CONCLUSION

{42} We affirm Defendant's conviction of DWI.

{43} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID, and CYNTHIA A. FRY, Judges.